UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

OLU A. RHODES,

                    Petitioner,

v.                                                    Case No. 13-cv-683-PP

MICHAEL MEISNER, WARDEN,

                    Respondent.

## DECISION AND ORDER DENYING PETITION FOR WRIT OF *HABEAS CORPUS* (DKT. NO. 1), DISMISSING CASE, AND GRANTING CERTIFICATE OF APPEALABILITY

Petitioner Olu A. Rhodes filed a petition for a writ of *habeas corpus* under 28 U.S.C. §2254, arguing that at trial, the Milwaukee County Circuit Court violated his rights under the Sixth Amendment Confrontation Clause by cutting off his lawyer's cross-examination of a witness called by the state.[1] The respondent did not raise in his response brief the issue of whether the alleged error was harmless for purposes of *habeas* review. The petitioner argued in reply that the respondent had waived the harmless error issue by failing to raise it, and urged this court not to consider it. The court subsequently directed the parties to brief the issue of whether the trial court's alleged constitutional error was prejudicial.

---

[1] The petitioner had raised three grounds for *habeas* relief in his petition. Dkt. No. 1 at 3-5. The petitioner abandoned two of these claims, leaving for this court to determine only his claim that the trial court violated his rights under the Confrontation Clause. Dkt. No. 16 at 2 n. 1.

1

The court denies the petitioner's petition for a writ of *habeas corpus*, because while it concludes that the trial court's refusal to allow the petitioner to cross-examine one witness on the issue of motive did constitute constitutional error, that error did not have a substantial and injurious effect or influence on the jury's verdict.

## I.    BACKGROUND

### A.    State Trial Proceedings

The petitioner and his half-brother, Jelani Saleem ("Saleem"), were tried together for the shooting death of Robert Davis ("Davis") and the shooting injury of Jonte Watt ("Watt"). Dkt. No. 16 at 2. During the trial, the state presented a motive theory to explain the shooting: the brothers shot and killed Davis because they thought Davis was responsible for inciting two women to beat the petitioner's sister, Nari Rhodes ("Nari"), and they shot Watt accidentally as he stood nearby. Id. at 2-3. The petitioner's defense was that he was not involved in Davis' death. Id. at 3.

The state called Nari as its own witness and tried to elicit testimony from her to support the state's motive theory, which it raised for the first time during its opening statement. The state asked Nari if her brothers knew of the beating, and she testified that they did. Dkt. No. 15-5 at 119. The state then asked whether that knowledge had "any impact" on the petitioner or Saleem. Id. at 120. Nari testified, "No." Id. The state followed up, asking, "Well, did they become angry? Either of them?" Id. Again, Nari testified, "No." Id. The state continued questioning Nari about her brothers' reaction by asking, "They just

took it calmly?" Nari testified, "Yes." Id. Persisting, the state asked, "That their sister had just been beaten?" Id. Again, Nari testified, "Yes." The trial court then called a recess.

After the recess, the state returned to its motive theory, reminding Nari that she had testified that the beating had no effect on her brothers. Dkt. No. 15-6 at 9. Nari replied, "They were more mad at me 'cause they said that I already knew that I was into it with Nancy Segura, I had no business going over there to try to get back any property." Id. The state then asked, "So they were mad at you because you got beat?" Id. Nari replied, "They weren't mad at me . . . for being beaten, no. They were mad at me for putting myself in the predicament to be beaten." Id.

In the course of the state's direct examination, Nari had testified that she and Davis "had a lot of domestic violence problems." Dkt. No. 15-5 at 107. The state did not follow up on that issue, but the petitioner's attorney did. In response to the state's attempt to prove its motive theory by questioning Nari, the petitioner's lawyer sought to cross-examine Nari about a time that Davis had beaten Nari. The petitioner's attorney asked the following series of questions:

> Q: Now, one of the other things you told your brothers, when you were describing what happened, is that Robert Davis was not involved in the attack upon you, right?
>
> A: Yes.
>
> Q: You did tell us . . . on direct examination that there had been domestic violence or violence between yourself and Davis before, right?

A: Yes.

Q: Before that date?

A: Yes.

Q: In fact, Mr. Davis had attacked you previous to April 3, 2006; is that right?

A: Yes.

Q: And you – On direct examination you said something to the effect that there had been a lot of that; is that right?

A: Yes.
*  *  *

Q: [I]n your conflict with Mr. Davis, have there been other times when you've been injured?

A: Yes.

Q: And what injuries had you received?

A: One side—My orbital bone in my eye was broken and it was like really bad.

Dkt. No. 15-6 at 19-20, 33.

At this point, the state objected, and the trial court called a sidebar. Id. at 34. The court cut off further questions on this subject. In the subsequent proffer after the sidebar discussion, the petitioner's lawyer stated that he had no intention of raising this subject, but had pursued this line of questioning in response to the state's motive theory and Nari's direct testimony. Id. at 88-90. The petitioner's lawyer identified the questions that he would have asked on cross-examination, and proffered the testimony he sought from Nari:

I asked Nari Rhodes about a particular incident. She said her orbital bone had been broken. That's a fairly serious injury. My next question would have been, well, what's your orbital bone? The question—She would have described as something around her eye.

After that I would have asked her did she make her brothers aware of that injury and who would have inflicted it and she would have said yes. There was no response from her brothers.

That was proper for me to try and rebut this motive information that the State has come forward with. It wasn't – I – I didn't get beyond that initial inquiry. I mean, she said that he damaged her orbital bone. I was not allowed to go any further than that.

I would have concluded that line of questioning within a few minutes. I was not trying to go, mindful of the court's previous ruling, on an injury-by-injury circumstance.

Id. at 88-89.

The state raised two objections to this line of questioning. First, it argued that it did not have notice of that particular incident (although Nari was the state's own witness). Second, the state raised a concern it had expressed before any evidence was introduced—that the defense would make "a history of domestic abuse" by Davis an issue at trial. Id. at 90. The state further argued that this evidence was "904.04 evidence, it's other acts . . . [a]s the court ruled in chambers prior to the evidence being taken in this case, that the parameters were a general mention can be made of the domestic abuse. It's in the record now and [the state was] objecting to any specific types of evidence regarding

904.04 evidence."[2] Id. at 90-91.

The trial court agreed with the state's recitation of the court's prior decision. The court then stated that the possibility of jury confusion had been a concern from the beginning of the trial, which was why the court had made an initial "ruling that we not get into evidence—extraneous evidence that would mislead the jury on other issues in a trial within a trial which is the concern."[3] Dkt. No. 15-6 at 91-92. The trial court permitted a general reference to the fact that there had been other instances of domestic abuse involving Nari and Davis, but would not permit the petitioner to make an instance-by-instance inquiry into that subject. Id. at 87-88. The court indicated that the parties apparently had agreed (or had been ordered) to avoid the subject altogether. Id. at 87. Because Nari had raised the issue in her direct testimony, however, the trial court stated that it believed that it had given the petitioner an

_____

[2] Section 904.04 is Wisconsin's "character evidence" statute, which provides that character evidence is generally "not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion." Section 904.04(2) is captioned "Other crimes, wrongs, or acts," and provides: "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Neither the Wisconsin Court of Appeals nor the Wisconsin Supreme Court expressly considered whether that evidence should have been admitted under section 904.04. Instead, the Wisconsin Supreme Court concluded that the trial court properly exercised its discretion under Wis. Stat. §904.03 to limit the petitioner's right to cross-examination in order to avoid confusing or misleading the jury. Rhodes, 799 N.W.2d at 862.

[3] The state explained in a brief filed in the Wisconsin Court of Appeals that the court appeared to have been referring to an unrecorded conference in which the state objected to the defense's mention of a history of domestic abuse in the defense's opening statements. Dkt. No 14-2 at 9 n.1.

"opportunity for fair response." Id. Because "there was no order to admit" testimony about specific instances of abuse, the court prevented any further questioning. Id. at 88.

The state presented substantial evidence that the petitioner was involved in the shooting and fired gunshots at Davis and Watt. Milwaukee Police Officer Eugene Reyes was the first uniformed officer on the scene of the shooting, within three minutes of receiving notice that a shooting had been called in. Dkt. No. 15-3 at 11. Reyes found Davis lying in the street and Watt sitting down on the sidewalk with a gunshot wound in his leg. Id. at 7-9. Reyes asked Watt if he had been shot. Id. at 9. Reyes testified that Watt was mumbling and said, "they shot my guy, they shot my guy." Id. Watt told Reyes that he was referring to "Olu and Jelani." Id. at 10. Watt later identified the petitioner and Saleem in photo arrays. Dkt. No 15-6, at 96-112

Watt testified that he, Davis and Dominique Walker (Watt's girlfriend and the mother of his child) were driving in a car, and Watt noticed that the petitioner was tailing them in a separate car. Dkt. No. 15-3, at 72. After a number of turns and a brief stop, they arrived at Watts' grandmother's house, the scene of the shooting. Id. at 81-82. Watt and Davis got out of the car, while Walker remained inside. Id. at 83. Watt testified that as he and Davis tried to enter the house, he saw the petitioner and Saleem approach the house with guns. Id. at 90-101. Watt testified that he began to hear "a little popping noise" and saw the petitioner shooting at Watt and Davis. Id. at 102-03. Watt and Davis ran off the porch together, right past the petitioner and Saleem. Id. at

106-08. Watt heard additional shots while he was running away. Id. at 113. At some point, Watt realized that he had been shot in the leg, and eventually he fell to the ground. Id. at 114-15. He also knew that Davis had fallen down, but did not see Davis get shot. Id. at 112-13. Watt testified he was positive that the petitioner and Saleem were the people who shot Watt and Davis. Dkt. No. 15-4, at 27-28. Walker also testified that the petitioner and Saleem were the people who shot Davis and Watt. Id. at 128-50. Her testimony generally was consistent with Watt's, and she identified both the petitioner and Saleem in photo arrays. Id. at 155-57.

A Sprint Nextel witness testified that Sprint produced call detail records for a cell phone number associated with Saleem, covering the days surrounding the shooting. Id. at 4-17. Sprint's representative also explained how to interpret the records, including call location and time information. Id. Using Sprint's call location and time information, a Wisconsin Department of Justice analyst plotted Saleem's cell phone locations on a map to show that the cell phone had been used in the neighborhood of the shooting in the relevant time frame. Dkt. No. 15-7 at 58-75.

Milwaukee Police Detective David Salazar testified that Letitia Dotson (the mother of the petitioner's daughter) had told him that the petitioner had called Dotson on the day of the shooting, and had told Dotson that the petitioner had shot Davis. Dkt. No. 15-6 at 46-48. Detective Willie Huerta, who participated in the interview with Dotson, corroborated Salazar's account. Id. at 142-47. Dotson testified that she remembered talking to the petitioner on the

telephone on the day of the shooting, and remembered that the petitioner said someone got shot. Dkt. No. 15-5 at 55-56. She either could not remember much more of what he said, however, or denied she made the statements to Officer Salazar, including that the petitioner told Dotson that he shot Davis and was sure that he hit him. Id. at 57-67.

The petitioner testified that Nari did not blame Davis for the beating. Dkt. No. 15-8, at 40-41. According to the petitioner, he knew that Davis was abusive toward Nari. Id. at 42. The petitioner testified that he had had a physical altercation with Davis when he first learned that Davis had harmed Nari, but he testified that that was the last time he had fought with Davis. Id. at 42-43. Despite the petitioner's and Saleem's efforts to convince Nari to stop seeing Davis, she continued to see him. Id. at 43-45. The petitioner testified that, on the day Watt and Davis were shot, he got a haircut and drove around the area of his neighborhood, talking to friends, and looking for marijuana and girls. Id. at 50-60. He testified that he saw Watt at one point in the day, but not Davis. Id. at 57-58. The petitioner testified that he learned that the police were looking for him in connection with the shooting when he met up with a friend, Banks, in South Milwaukee later that afternoon. Id. at 61-62.

The jury found the petitioner guilty of first-degree intentional homicide as party to a crime, and first-degree recklessly endangering safety as party to a crime. The jury acquitted Saleem.

B.     The Wisconsin Court of Appeals

The petitioner raised four issues on direct appeal:

(1) the trial court erred when it cut off his cross-examination of Nari while he was trying to "rebut the State's allegation that the petitioner had a motive to harm the victim;"

(2) the trial court erroneously allowed a state witness to give allegedly unqualified expert testimony;

(3) the trial court erroneously allowed the state to use cellular telephone records to place Saleem and the petitioner at the scene of the shootings; and

(4) the trial court erroneously excluded prior-conviction evidence of one of the victims. The Wisconsin Court of Appeals unanimously reversed on the first issue and remanded for a new trial. State v. Rhodes, 329 Wis. 2d 268, 789 N.W.2d 753 (Ct. App. 2010). That court did not address the three other issues the petitioner had raised.

The Wisconsin Court of Appeals began its analysis with the text of the Sixth Amendment to the U.S. Constitution, which guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. This clause applies to the states as well as to the federal government." Id. at ¶9. Article I, Section 7 of the Wisconsin Constitution "also guarantees the right to confrontation: In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face." Id. The court continued, citing United States Supreme Court precedent holding that "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Id. (citing Davis v. Alaska, 415 U.S. 308, 315–316 (1974) (internal quotation marks omitted)).

The appellate court concluded that the trial court violated the petitioner's constitutional right to cross-examination by terminating his lawyer's examination of Nari too quickly. The court noted that the state had emphasized the petitioner's motive to avenge his sister's beating in its opening statement, during the testimony, and in its closing argument. Id. at ¶10. As framed by the appellate court, the state's argument was that the petitioner "hunted Davis down" and killed him after the petitioner found out that Davis had his sister beaten. Id. Given that argument, the appellate court decided that the trial court had violated the petitioner's Sixth Amendment rights by truncating the petitioner's lack-of-motive defense when it stopped him from presenting evidence that he did not react violently when Davis had earlier hurt his sister. Id. The appellate court explained:

> the jury *could have* concluded that the beating that the State contends gave Olu A. Rhodes the motive to kill Davis in this case was the last straw and that the earlier incidents contributed to what the State asserted was Olu A. Rhodes's and Saleem's rage, the jury could have also reached the conclusion advanced by Olu A. Rhodes's lawyer. This was, therefore, a matter that the jury had to resolve, and it needed to have a full picture of the dynamics that roiled the relationships in this case. By cutting off the cross-examination of Nari Rhodes when Olu A. Rhodes's lawyer was trying to rebut the State's motive theory, the trial court deprived Olu A. Rhodes of his constitutional right to a fair trial.

Id.

In a footnote, the court addressed the state's harmless error argument. Id. at n.1. The state argued that, because the petitioner had testified to a prior physical confrontation after he first learned about the domestic violence, it

"seem[ed] far more likely" the jury would have believed the state's theory over the petitioner's theory. Id. The appellate court rejected that argument, concluding that the state did not show that the error was harmless beyond a reasonable doubt. Id.[4]

C.    The Wisconsin Supreme Court

The Wisconsin Supreme Court ruled that the trial court did not abuse its discretion or violate the petitioner's Sixth Amendment rights by limiting his cross-examination of Nari. State v. Rhodes, 336 Wis. 2d 64, 799 N.W.2d 850 (2011). The majority characterized the petitioner's "chief argument" as follows:

> [H]e should have been allowed to cross-examine Nari to rebut the State's theory of motive—namely, that Rhodes and Saleem gunned down Davis, and in the process also shot Watts, in an attempt to avenge the beating Nari had incurred at Davis's alleged direction. Rhodes argues that to effectively rebut the State's theory, he should have been allowed to cross-examine Nari regarding the previous incidents of domestic violence at Davis's hand that the brothers had not avenged. To be denied this opportunity, he contends, violated his Sixth Amendment right to cross-examination.

Id. at 860. Like the appellate court, the Wisconsin Supreme Court began its

---

[4] The "beyond a reasonable doubt standard" is the standard that applies to a harmless error analysis in the Wisconsin courts on direct review. A different standard of review applies, however, in a federal *habeas* case. The Supreme Court has held that a less stringent standard of review applies on federal collateral attack—whether the error alleged to be harmless "had a 'substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993). See also Yancey v. Gilmore, 113 F.3d 104, 108-09 (7th Cir. 1997) (applying this standard in the context of determining whether a state court's restriction on cross-examination constituted harmless error). The court will refer to this distinction further in its analysis.

analysis with the text of the Sixth Amendment, and referenced Article I, Section 7 of the Wisconsin Constitution. Id. at 856-57. These provisions are "generally" coterminous, and the court applied United States Supreme Court precedent in its analysis. Id. at 857 (citing State v. Hale, 277 Wis. 2d 593, 691 N.W.2d 637) (2005)).

The Wisconsin Supreme Court recognized that the Supreme Court has held that the "main and essential purpose" of the confrontation clause is to give the accused an opportunity to cross-examine the witnesses against him. Id. (quoting Davis v. Alaska, 415 U.S. 308, 315–16 (1974)). It further cited Supreme Court case law explaining that the right to cross-examine often is implicated in the context of an accused's attempt to test the credibility of an adversary witness. Id. (citing Delaware v. Van Arsdall, 475 U.S. 673, 678–79 (1986); Davis, 415 U.S. at 316–17). At the most fundamental level, the right to confrontation through cross-examination allows the accused to test the "believability of a witness and the truth of his testimony." Id. (citing Davis, 415 U.S. at 316; Crawford v. Washington, 541 U.S. 36, 61 (2004) (the confrontation clause is intended to allow the reliability of testimony to be assessed "by testing in the crucible of cross-examination")).

The Wisconsin Supreme Court explained that Supreme Court case law makes clear that "the right to cross-examination under the confrontation clause is not absolute." Id. at 858 (citing Van Arsdall, 475 U.S. at 679). "Because the right to cross-examination is not absolute, the Supreme Court has held that the right to confrontation may be limited where necessary to

further an important public policy, so long as there are means to assure the reliability of the witness's testimony." Id. (citing Maryland v. Craig, 497 U.S. 836, 850 (1990)). Under those precedents, the Wisconsin Supreme Court wrote that, "faced with the danger of undue prejudice . . . , circuit courts can weigh the probative value of the evidence proffered with the dangers it brings." Id. at 863.

That court also highlighted Supreme Court case law holding that the "confrontation clause does not guarantee cross-examination 'that is effective in whatever way, and to whatever extent, the defense might wish.'" Id. at 858 (citing Delaware v. Fensterer, 474 U.S. 15, 20 (1985)). The Wisconsin court noted that although the witness in Fensterer could not recall the particular basis upon which he had formed his expert opinion, the Supreme Court had court held that the confrontation clause was satisfied because the defense was given a full opportunity to expose his forgetfulness. Id. (citing Fensterer, 474 U.S. at 21–22). "That the defense might have preferred that the expert 'embrace a particular theory, which it [was] prepared to refute with special vigor, is irrelevant.'" Id. (quoting Fensterer at 19). The confrontation clause guarantees only the *opportunity* to cross-examine witnesses. Id. (quoting Fensterer at 20). The court agreed with the Supreme Court that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. at 859, quoting

<u>Van Arsdall</u>, 475 U.S. at 679.

The Wisconsin Supreme Court did not think Nari's testimony supported the state's motive theory.

> If anything, Nari's testimony seemed to refute the State's theory of motive, because she testified that she and Davis had a friendly relationship, and that Davis repeatedly warned her to leave the scene when Segura arrived and became angry. Nothing in her testimony suggested that she believed Davis orchestrated the beating she received at the hands of Segura and Bell. According to her testimony, Nari told her brothers that the two women were responsible, not Davis, and that the brothers took the news calmly. Counter to the State's theory that Rhodes and Saleem believed Davis was responsible, Nari testified that her brothers were upset that she had put herself in the situation because of the bad blood between Nari and Segura, not between Nari and Davis.

<u>Rhodes</u>, 799 N.W.2d at 862. Nevertheless, that court determined that the testimony the petitioner sought to elicit from Nari was relevant, because the state made the petitioner's motive to harm Davis a fact of consequence. As the Wisconsin Supreme Court explained, "Rhodes is attempting to use a State witness to rebut the State's theory of" his motive for committing a crime, "even though Nari had provided little support for the State's theory in her testimony." <u>Id.</u> at 860. The petitioner was not denied the opportunity to show that Nari was biased against him or had a motive to lie, which the majority said might have been a different issue. <u>Id.</u>

The Wisconsin Supreme Court decided that the "circuit court was faced with a difficult dilemma, one that required a delicate balance between Rhodes' constitutional rights on one hand and the dangers of confusion of the issues

and misleading the jury on the other." Id. at 863. That court reasoned that

> Judge McMahon's concerns were not without reasonable basis. This case already involved two defendants, only one of whom testified. Over the course of the four-day trial, testimony was taken from sixteen witnesses, including Watts, the surviving victim of the crime. The jury was already presented with the difficult task of taking the often-conflicting testimony it heard and weighing it on two charges against two separate defendants.

Id. at 862. The Wisconsin Supreme Court highlighted the circuit court's concerns "that the jury would be misled into an improper focus on questions about motive and the alleged history of abuse between the victim and Nari," and "the possibility that if Rhodes were allowed to emphasize his rebuttal theory he would not have retaliated against Davis for the April 3 incident because he had not retaliated against him before, he would have confused the issues." Id. The petitioner's testimony "would have put Davis—the deceased victim—on trial for alleged prior incidents of domestic violence, [and] would have required the jury to speculate as to whether a lack of retaliation for Davis's prior assaults on Nari magnified Rhodes' motive in this instance," explained that court. Id.

The Wisconsin Supreme Court concluded that the circuit court

> was clearly mindful of the importance of allowing Rhodes to rebut the State's theory of motive. Both Nari and Rhodes were allowed to present their side of the story to rebut the State's theory of motive. The jury could reasonably have viewed their testimony as contradicting the State's theory . . . [t]here is no indication that this story would have been more persuasive if Nari had been allowed to testify that there was no retaliation after the incident when Davis assaulted her and broke her orbital bone.

16

Id. That court decided that the trial court "considered arguments by all counsel," and then proceeded to demonstrate a "logical process of reasoning, applying the correct standard of law to the facts of the case. Rhodes' right to cross-examination under the confrontation clause was not violated when the court limited his cross-examination of his sister, Nari." Id. at 863. The Wisconsin Supreme Court explained that "the question is not whether we would have drawn the line the same as the circuit court did, but whether the circuit court's line-drawing was a reasonable exercise of its discretion." Id. Because that court concluded that the circuit court did not err in limiting the defense's cross-examination of Nari regarding prior incidents of abuse, it did not reach the question of harmless error. Id. at 863, n.8. That court remanded the case for consideration of the petitioner's other grounds for relief. Id. at 864.

In a short dissent, two justices agreed with the Wisconsin Court of Appeals' decision that the trial court was too quick to terminate the petitioner's lawyer's examination of Nari, given the prominent role the state's motive theory played in all phases of the trial. Id. at 864. Because the petitioner wanted to question Nari in order to expose the weakness of the state's motive theory, the dissenting judges reasoned that the ordinary probative value versus undue prejudice balancing test employed by the trial court did not adequately protect the petitioner's Sixth Amendment right to confront witnesses. The dissenting justices submitted that the trial court should have given the petitioner "more protection and leeway" in questioning Nari. Id. at 865.

The dissent asserted that a "defendant's fundamental constitutional right

17

of confrontation surely affords the defendant more protection and leeway in cross-examining a witness than the standard analysis used in discretionary evidentiary decisions when a fundamental constitutional right is not implicated." Id. In support of that position, the dissent cited State v. St. George, 252 Wis. 2d 499, 643 N.W.2d 777 (2002), in which the defendant argued that his constitutional right to present a defense was violated through the exclusion of an expert witness. In that case, the court held that "the circuit court must adhere to the evidentiary rules applicable to expert witnesses, and . . . , because the defendant asserted that the exclusion of the evidence would violate his constitutional right to present a defense, the circuit court must consider the constitutional law principles in making its evidentiary ruling." Id. The dissenting judges concluded that the "circuit court's limitation was not reasonable or necessary in light of the defendant's offer of proof, the competing interests examined by the circuit court, and the defendant's fundamental constitutional right." Id.

## II.    APPLICABLE STANDARDS OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") a state prisoner is entitled to seek *habeas* relief on the ground that he is being held in violation of federal law or the U.S. Constitution. 28 U.S.C. § 2254(a). But when a state court already has adjudicated the petitioner's claim on the merits, as is the case here, AEDPA precludes *habeas* relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d).

"Clearly established Federal law" refers to the holdings of the Supreme Court that existed at the time of the relevant state court adjudication on the merits. Greene v. Fisher, 565 U.S. 34, 132 S. Ct. 38, 44 (2011); Williams v. Taylor, 529 U.S. 362, 412 (2000). A decision is "contrary to" federal law if the state court applied an incorrect rule—*i.e.,* one that "contradicts the governing law" established by the Supreme Court—or reached an outcome different from the Supreme Court's conclusion in a case with "materially indistinguishable" facts. Williams, 529 U.S. at 405–06. A state court unreasonably applies federal law when it "identifies the appropriate standard but applies it to the facts in a manner with which a reasonable court would disagree." Etherly v. Davis, 619 F.3d 654, 660 (7th Cir. 2010) (citing Williams, 529 U.S. at 413, and Williams v. Thurmer, 561 F.3d 740, 742–43 (7th Cir. 2009) (per curiam)). "Mere error" is not enough to overcome AEDPA deference; instead, the state court's decision must be objectively unreasonable, Etherly, 619 F.3d at 660, meaning it is "beyond any possibility for fairminded disagreement," Mosley v. Atchison, 689 F.3d 838, 844 (7th Cir. 2012) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).

Because the petitioner's "challenge is a constitutional one, he must also convince [the court] that the alleged error 'had substantial and injurious effect or influence in determining the jury's verdict' in order to have his habeas

petition granted." Jones v. Basinger, 635 F.3d 1030, 1052 (7th Cir. 2011) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). "Due to the concerns of federalism, finality, and comity that attend habeas proceedings, a habeas petitioner must show that a constitutional error was not harmless to succeed on his petition." Hall v. Zenk, 692 F.3d 793, 805 (7th Cir. 2012) (citing Jones, 635 F.3d at 1052). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." Brecht, 507 U.S. at 637 (citations and internal quotation marks omitted).

When evaluating a *habeas* petitioner's claim under §2254, "a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness." Fry v. Pliler, 551 U.S. 112, 121–22 (2007). So, Brecht's "actual prejudice" standard applies "regardless of whether the state appellate court determined that the error was harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18, 87 S. Ct. 824 (1967)." Jones, 635 F.3d at 1030 (quoting Fry, 551 U.S. 112, 121–22).

"The Brecht standard reflects the view that a 'State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." Davis v. Ayala, ___ U.S. ___, 135 S. Ct.

2187, 2198 (2015) (quoting <u>Calderon v. Coleman,</u> 525 U.S. 141, 146 (1998)).

But, "if a habeas court has so much as a 'grave doubt as to the harmlessness

of [a constitutional error], it should grant relief.' <u>Jones</u>, 635 F.3d at 1030

(quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 445 (1995)). In conducting this

analysis, the court examines factors such as "the importance of the witness'

testimony in the prosecution's case, whether the testimony was cumulative, the

presence or absence of evidence corroborating or contradicting the testimony of

the witness on material points, the extent of cross-examination otherwise

permitted, and, of course, the overall strength of the prosecution's case." <u>Id.</u>

(quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986)).

## III.  ANALYSIS

### A.  <u>It Was Appropriate for the Court to Request Briefing On The Issue Of Harmless Error.</u>

In <u>United States v. Giovannetti</u>, 928 F.2d 225, 226-27 (7th Cir. 1991),

the Seventh Circuit held that appellate courts have the authority to raise

harmless error *sua sponte* under certain circumstances, even though the

parties waived or forfeited the issue. The Seventh Circuit has not expressly held

that this authority extends to district courts, but other courts have decided

that it does. <u>Gover v. Perry</u>, 698 F.3d 295, 301 (6th Cir. 2012) ("The district

court also may *sua sponte* exercise its discretion in raising harmlessness when

reviewing habeas petitions."); <u>Prevatte v. French</u>, 547 F.3d 1300, 1305 (11th

Cir. 2008) (holding "that the district court was within its powers in performing

a *sua sponte* harmless error review," and noting that petitioners "are not

entitled to habeas relief based on trial error unless they can establish that it

21

resulted in actual prejudice") (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)); <u>Saldano v. Cockrell</u>, 237 F. Supp. 3d 635, 644 (E.D. Tex. 2003) (recognizing that the district court has jurisdiction to raise *sua sponte* the issue of whether a constitutional violation was harmless).

In this case, the parties' initial briefing addressed whether the trial court's decision to cut off the petitioner's lawyer's cross-examination of Nari violated the petitioner's Sixth Amendment rights under the Confrontation Clause. The petitioner's initial brief focused on whether the state court's decision was contrary to or an unreasonable application of Supreme Court case law, and did not discuss whether that the trial court's error was so prejudicial as to require a new trial under <u>Brecht</u>. The state did not raise harmless error in its response brief. The petitioner argued in his reply brief that the state had waived the harmless error issue, so this court should not consider it.

Because neither party had addressed whether the trial court's error was sufficiently harmful to satisfy the <u>Brecht</u> standard, the court asked the parties to file supplemental briefs on that issue. The petitioner argues that this court should not consider this issue, because the state failed to raise it in its response brief. In the petitioner's view, a finding that the trial court violated the petitioner's Sixth Amendment rights is all that is necessary for purposes of granting relief on his *habeas* claim, not whether that error caused actual prejudice. The petitioner argued that the trial court's error was prejudicial, but also maintains that this court should not consider that issue at all. The state responded that §2254(a) and Supreme Court case law establish that this court

must consider whether the trial court's alleged constitutional error is prejudicial under Brecht, because the petitioner's conviction would not violate the Constitution if the trial court's error did not cause actual prejudice.

The court agrees with the state. Constitutional error alone is not a sufficient basis to grant *habeas* relief; the court also must find that the trial court's error caused actual prejudice. Brecht, 507 U.S. at 637. If a court finds a constitutional error in a *habeas* case, Brecht mandates a further prerequisite to relief: whether the "error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" Id. at 637 (internal citation omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Actual prejudice (or harmless error) is not an issue the court reaches only if the respondent raises it—it is an issue that the court must decide in the petitioner's favor before the court can grant relief on the petitioner's *habeas* claim.

> B.  The Wisconsin Supreme Court Unreasonably Applied Controlling United States Supreme Court Precedent In Concluding That The Trial Court Did Not Violate The Petitioner's Sixth Amendment Rights.

The Wisconsin Supreme Court's opinion is the last reasoned opinion addressing the petitioner's Sixth Amendment claim, so this court looks that opinion on *habeas* review. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). In order to conclude that the Wisconsin Supreme Court unreasonably applied clearly established Supreme Court precedent, the court must find that the

Wisconsin Supreme Court's decision was "objectively unreasonable." <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000). The Seventh Circuit has explained that an unreasonable state court decision is one lying well outside the boundaries of permissible differences of opinion or one that is at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable." <u>Badelle v. Correll</u>, 452 F.3d 648, 655 (7th Cir. 2006) (internal citations and quotation marks omitted).

In <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967), the Supreme Court held:

> The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

In <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678 (1986), the Supreme Court stated that "[t]he Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him . . . *to secure for the opponent the opportunity of cross-examination.*" (citing <u>Davis</u>, 415 U.S. 308, 315-16 (1974) (internal quotations and citations omitted)).

Nonetheless,

> trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally

> relevant. . . . "[T]he Confrontation Clause guarantees
> an *opportunity* for effective cross-examination, not
> cross-examination that is effective in whatever way,
> and to whatever extent, the defense might wish."

Id. at 679 (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)). A Sixth

Amendment violation occurs when the defendant shows that the court denied

him the opportunity to elicit testimony that would be "relevant and material to

the defense." United States v. Vasquez, 635 F.3d 889, 895 (7th Cir. 2011)

(citing United States v. Williamson, 202 F.3d 974, 979 (7th Cir. 2000)). But

"the denial of the opportunity to cross-examine an adverse witness does not fit

within the limited category of constitutional errors that are deemed prejudicial

in every case." Fensterer, 474 U.S. at 682.

Despite the significant evidence presented at trial that the petitioner had

shot Davis and Watt, the state apparently believed it needed to support its case

with a motive theory. Dkt. No. 15-2 at 4-5. In its opening statement, the

prosecutor said that "there was bad blood" between the victims and defendants

and "[t]hey didn't like each other." Dkt. No. 15-2 at 78. The prosecutor told the

jury that "the State's not required to prove motive . . . but you can weigh in

whether or not you determine there's a motive and a connection between the

incidents of" Nari's beating and the shooting of Davis and Watt. Id. at 79.

The Wisconsin Supreme Court identified the standards set forth in Davis

v. Alaska, Delaware, and Van Arsdall, and correctly explained that unId.der

Supreme Court case law, the circuit court generally has discretion to limit

cross-examination in order to avoid confusion of the issues. Rhodes, 799

N.W.2d at 858-59. The Wisconsin Supreme Court reasoned that the trial judge

"was concerned that the jury would be misled into an improper focus on questions about motive and the alleged history of abuse between the victim and Nari." Id. at 862. The Wisconsin Supreme Court found that the trial court followed a "logical reasoning process" and discerned "no evidence of an erroneous exercise of discretion." Id. at 863.

On review of the trial record, this court concludes that the Wisconsin Supreme Court unreasonably applied Van Arsdall and Davis v. Alaska, because the record does not adequately support its decision. The trial court allowed the state to use the petitioner's sister to support its theory that the petitioner sought out and shot Davis to avenge her beating. Once the court allowed the state to raise the issue, it is hard to see how "questions about motive" could be "an improper focus," or could be misleading to the jury. Id. at 862. After all, the Wisconsin Supreme Court's opinion infers that it was proper for the state to raise its motive theory, and to attempt to prove it through Nari's testimony. Id. at 860-61. The Wisconsin Supreme Court concluded that the trial court was within its discretion to terminate the petitioner's cross-examination to avoid confusing the jury, but that court's opinion does not explain how *the petitioner's* questions, as opposed to the state's questions, raised such a risk of jury confusion to warrant cutting off the petitioner's cross-examination. Nor does that court's opinion explain why it concluded that the trial court was within its discretion to terminate the petitioner's cross-examination of Nari on an issue that it had allowed the *state* to raise on direct examination. By allowing the state to elicit testimony from Nari that she and Davis had "a lot of

domestic violence problems" in the past, and by forestalling cross-examination that could have undermined the state's theory that the petitioner shot Davis in retaliation for Davis' alleged role in inciting two women to beat Nari on the day before the shooting, the trial court allowed the state to eat its cake and still have it.

This court finds that the Wisconsin Supreme Court unreasonably concluded that the testimony the petitioner's lawyer sought to elicit, with just a few questions, could have confused the jury. It is more likely that the jury was left confused *as a result of* the trial court's decision to cut off the cross-examination. When the trial court stopped the petitioner's lawyer from questioning Nari, the jury already had heard Nari testify—in response to the petitioner's lawyer's questions—that Davis had beaten her in the past and had broken her orbital bone. It is possible that the jury was left wondering why the petitioner's lawyer had asked this line of questions, which established that Davis had hit the petitioner's sister hard enough to break bones in her face, but not explained how the answers might or might not have related to the state's motive theory. The jury could have believed that the petitioner's lawyer elicited testimony that supported the *state's* motive theory.

According to the petitioner's lawyer, he would have asked Nari several more questions, and in response she would have testified that (1) her orbital bone is a bone around her eye; (2) the petitioner knew of that injury and that Davis caused it; but that (3) the petitioner did not react violently or try to avenge Nari's injury by harming Davis. The trial court prevented the

petitioner's counsel from asking Nari the two questions that really mattered in that part of his cross-examination—"Did your brothers know Davis broke your orbital bone?," and "Did they attempt to retaliate physically because of what Davis did?" The trial court did not allow the jury to hear Nari testify that her brothers did not pursue street justice after that incident, so the petitioner was unable to use her testimony on cross-examination to counter the state's motive argument, and the jury likely was left confused as to why the petitioner's lawyer elicited testimony that arguably would have given the petitioner a motive to harm Davis.

The Wisconsin Supreme Court did not adequately consider how the trial court's decision to cut off the petitioner's cross-examination affected the petitioner's rights under the Confrontation Clause. The Confrontation Clause guarantees an opportunity for *effective* cross-examination," <u>Fensterer</u>, 474 U.S. at 20, subject to certain limitations, including "confusion of the issues." <u>Van Arsdall</u>, 475 U.S. at 679 (emphasis added). The Wisconsin Supreme Court recognized that the state had raised Davis's past abuse of Nari to support its case, but failed to appreciate that the trial court did not allow the petitioner to cross-examine her *effectively* on that topic. That court did not recognize that the consequence of the trial court's decision was to allow the petitioner's cross-examination to *bolster* the state's motive theory, making the petitioner's cross-examination confusing to the jury at best and harmful to his defense at worst. To use the trial court's words, on cross-examination, the petitioner did not have an "opportunity for fair response" to the state's attempt to question Nari

in support of its motive theory. Given the point at which the trial court terminated the petitioner's lawyer's cross-examination, the limited number of additional questions the petitioner's attorney would have asked, the purpose for which the petitioner's lawyer sought to ask those additional questions, and the state court's inadequate justification for disallowing them, the court concludes that the Wisconsin Supreme Court's decision unreasonably applied Fensterer, Van Arsdall and Davis v Alaska.

C.      The Circuit Court's Error Was Harmless In Light Of The
        Overall Strength Of The State's Case and the Relative
        Unimportance of the Motive Evidence.

Whether the trial court's was "harmless" for purposes of *habeas* review "depends upon . . . the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684. The court will begin by considering the importance of Nari's testimony to the prosecution's case, and the effect of the trial court's limitation on the petitioner's cross-examination on the defense.

The state raised its motive theory in its opening statement, and attempted to support it with Nari's testimony. Dkt. No. 15-2 at 77-79. The petitioner argues that Nari's proffered testimony was important because, in his opinion, the state's motive theory was the "primary evidence" of the petitioner's guilt. Dkt. No. 27 at 6. The petitioner contends that motive was "central" and

"critical" to the state's case, a fact that he claims magnified the impact of the trial court's error and resulted in prejudice. Dkt. No. 24 at 11.

The court finds, however, that state's motive theory did not play a significant role in the state's case-in-chief, in its closing argument, or in its rebuttal, when compared to the state's evidence of the petitioner's involvement in the shooting. In the state's closing argument, after summarizing the evidence at length, the state reiterated one of the court's instructions: that the jury did "not need to come up with a motive." Dkt. No. 15-9 at 41. The state offered its theory that the petitioner was motivated to harm Davis because he had incited two women to beat Nari on the day before the shootings, but spent little time discussing motive compared to the time it spent discussing the evidence of the petitioner's guilt. Compare id. at 29-41 with id. at 41-42. In rebuttal, the state briefly argued that the petitioner and his brother had a motive to harm Davis, but not Watt, then moved on to discuss the evidence in more detail. Id. at 90-91.

The court further finds that Nari's direct testimony *as to motive* did not give substantial support the state's motive theory. Nari repeatedly testified that the petitioner *did not* become angry after he learned Davis arranged for Nari's beating on April 3, 2006. Dkt. No. 15-5, at 119-20; Dkt. No. 15-6 at 9. As the Wisconsin Supreme Court stated, the state's lawyer arguably undermined his own theory through his direct questioning of Nari, because Nari testified that the petitioner did not become angry on at least one past occasion after he learned Davis had beaten Nari. Rhodes, 799 N.W.2d at 862.

Further, even though the petitioner was not able to elicit testimony from Nari that the petitioner was not angry about the beating Nari received on the day before the shootings, the petitioner *was* able to present the evidence he wanted the jury to hear through other means—his own testimony. Id. at 862-63. The petitioner testified that he knew Davis abused Nari, but that he confronted him physically only once—the first time it happened. Dkt. No. 15-8 at 43. He testified that he decided there was nothing he could do to stop Nari from going back to Davis, even though Davis continued to abuse her, so he "just left it alone." Id. at 44. Consequently, there is evidence in the trial record supporting the petitioner's rebuttal. Perhaps the jury might have given less credence to the petitioner's testimony given his self-interest, but it is also possible the jury might have discounted Nari's testimony given her relationship to the petitioner.

The court finds the facts of this case are not analogous to those in Jensen v. Clements, 800 F.3d 892, 905 (7th Cir. 2015), on which the petitioner relies. In that case, the prosecution ended its closing argument with an improperly admitted, but highly "emotional and dramatic . . . letter from the grave" that implicated the petitioner as the decedent's murderer. Id. at 899. The Seventh Circuit concluded that admission of the letter violated the petitioner's rights under the Confrontation Clause. In evaluating whether the petitioner was prejudiced by that constitutional error, the Seventh Circuit described the case as "no slam dunk," in which "[t]he evidence was all circumstantial," including evidence supporting the petitioner's theory that the

decedent had committed suicide. Id. at 906. The court found that the letter was "unlike anything else in evidence," which "played a key role in from the outset," id. at 904, and that the trial court's error in admitting it had a substantial and injurious effect on the verdict. Id. at 905-06.

In this case, the state's motive theory provided an explanation for why the petitioner and Saleem shot at Davis and Watt. But given the evidence against the petitioner, the state's theory did not serve as the bridge from weak evidence to a guilty verdict and, contrary to the petitioner's argument, the state did not make motive the central focus of its case. As discussed below, the state did need to devote much attention to its motive theory given the strength of the direct and circumstantial evidence connecting the petitioner to the shootings.

Van Arsdall directed courts to consider the "overall strength of the prosecution's case," although harmless error review does not focus solely on the sufficiency of the evidence supporting the petitioner's conviction. Van Arsdall, 475 U.S. at 684. The state supported its case with significant evidence of the petitioner's guilt. See supra, 6-8. Multiple police officers testified at trial that civilian witnesses informed them that the petitioner was involved in the shooting, and fired shots at Davis. Salazar and Huerta testified that Dotson, the mother of the petitioner's daughter, told them that the petitioner confessed his role in the shooting to her on the same date as the shooting. Huerta prepared a contemporaneous report that corroborated the officers' testimony that Dotson had made those statements to the officers on the date of the shooting. Dkt. No. 15-6 at 144-47. According to Salazar, the petitioner told

Dotson that he "shot him," and after Dotson asked who the petitioner had shot, the petitioner replied, "Rob." Id. at 47. In a second call, the petitioner told Dotson that he "shot that . . . Rob six times." Id. at 48. The petitioner's statements to Dotson, made on the same date as the shooting and admitted through the testimony of Huerta and Salazar, along with Huerta's report regarding Dotson's interview, corroborated his guilt. Dkt. No. 15-6 at 44-51, 143-147. The cell tower evidence reflected several calls made from Saleem's cell phone to Dotson's telephone number; the calls began to originate in the vicinity of the shooting, very near the time of the shooting, and eventually moved westward and ended up in South Milwaukee. Dkt. No. 15-4 at 6-17, Dkt. No. 15-7 at 58-77.

Watt and Walker testified that, as they were driving, a red Buick Riviera driven by the petitioner followed them; the petitioner testified that he often drove the same make, model, and color car, which was registered in Nari's name but which was "pretty much [the petitioner's] car." Dkt. No. 15-3 at 72; Dkt. No. 15-4 at 128; Dkt. No. 15-8 at 51-52. Watt and Walker both testified that that they saw the petitioner shoot at Davis and Watt, Dkt. No. 15-3 at 93-94, 102-03; Dkt. No. 15-4 at 141. Immediately after the shooting, Watt told Reyes that the petitioner and Saleem had shot Watt and Davis. Dkt. No. 15-3 at 10. Walker identified the petitioner and Saleem in photo arrays and testified at trial that they were the shooters. Dkt. No. 15-4 at 155-57.

In contrast, the petitioner contended that he was not present at the scene of the shooting and was not involved in it. According to the petitioner, he

spent the day of April 4, 2006 moving from place to place, seeing friends and other individuals (including Watt), getting a haircut and purchasing marijuana. Dkt. No. 15-8, at 33, 50-59. The petitioner testified that he eventually went to see a friend in South Milwaukee later in the day, and learned that the police were looking for him in connection with the shooting. Id. at 60-61.

That is not to say that the record was completely one-sided, containing no evidence that favor the petitioner. Walter Henderson, Watt's grandfather, observed the shooting and saw one of the shooters, but did not identify the petitioner as a shooter. Dkt. No. 15-4 at 106-07, 111-15. Portions of Watt's and Walker's trial testimony about the appearance of the two shooters (their height, clothing, etc.) and the shooters' actions were inconsistent with their prior statements contemporaneous with the shooting, or with other portions of their trial testimony. Dkt. No. 15-3 at 94; Dkt. No. 15-4 at 76; Dkt. No. 15-5 at 6-7; Dkt. No. 15-8 at 105-06. The defense contended that Watt's testimony was suspect because he was Davis's best friend, and implied that Watt may have influenced Walker's testimony. Dkt. No. 15-3 at 69; Dkt. No. 15-5 at 12-13.

But considering the overall strength of the state's case, the slim defense, the relative insignificance of Nari's testimony as to motive (and the damage her testimony did to the state's motive theory), as well as the petitioner's own testimony that he did not react violently in response to Davis's past beating of Nari, the court determines that the trial court's decision to limit Nari's cross examination did not have a substantial and injurious effect on the jury's verdict. Consequently, the trial court's error is harmless for purposes of *habeas*

review, and this court must deny the petition.[5]

## IV. THE COURT WILL ISSUE A CERTIFICATE OF APPEALABILITY

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).

Where, as here, a district court has rejected a petitioner's constitutional claims on the merits, "the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. at 484. The court finds that the evidence of the petitioner's guilt is overwhelming, certainly enough to dispel a "grave doubt" that the trial court's error caused actual prejudice to the petitioner at trial. Because jurists of reason might debate that conclusion, however, the court will issue a certificate

---

[5] After the parties briefed the harmless error issue, the petitioner supplemented the record with the Seventh Circuit's decision in Kubsch v. Neal, 838 F.3d 845 (7th Cir. 2016). The Kubsch decision is relevant to the question of whether the trial court (and the Wisconsin Supreme Court in affirming the trial court's decision) unreasonably applied the law. Given the court's decision regarding harmless error, however, the Kubsch decision does not impact the outcome of the court's decision regarding the petition.

of appealability as to the petitioner's claim that the trial court deprived him of his Sixth and Fourteenth Amendment rights to confront witnesses against him.

## IV. CONCLUSION

For the reasons explained above, the court concludes that the Wisconsin Supreme Court unreasonably applied Supreme Court case law, but denies the petition because the trial court's constitutional error did not have a substantial and injurious effect or influence on the jury's verdict. The court will issue a certificate of appealability because the petitioner has made a substantial showing of constitutional error and the issues are adequate to deserve encouragement to proceed further, even though this court has determined that the error did not have a substantial and injurious effect or influence on the jury's verdict.

The court **DENIES** the petition. Dkt. No. 1. The court **GRANTS** the petitioner a certificate of appealability as to Claim I of his petition. The court orders that the case is **DISMISSED**.

Dated in Milwaukee, Wisconsin this 30th day of May, 2017.

BY THE COURT:

_____
HON. PAMELA PEPPER
United States District Judge